IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-151-BR

| | | |
|---|---|---|
| AMERICAN DAIRY QUEEN CORPORATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| YS&J ENTERPRISES, INC. and JOHN A. RIBET III, | ) ) ) | |
| Defendants. | ) ) ) | |

On 2 April 2014, the court held a hearing on plaintiff American Dairy Queen Corporation's motion for a preliminary injunction. (DE # 8.) Although defendants were notified of their briefing deadline and the hearing date, they have not responded to plaintiff's motion nor did they appear for the hearing. As announced at the hearing, the motion for preliminary injunction is ALLOWED. The following sets forth the court's opinion for this disposition.

## I. BACKGROUND

Plaintiff franchises third parties to operate retail restaurants selling soft serve dairy products and other food products using its Dairy Queen® and Orange Julius® trademarks. (Beck Decl., DE # 11, ¶¶ 3-5.) In 2004, it entered into an agreement with defendant YS&J Enterprises, Inc. ("YS&J") to operate such a restaurant at Cross Creek Mall, Fayetteville, North Carolina (the "Store"). (Id. ¶ 6.) In 2012, plaintiff issued to YS&J a notice of default based on YS&J's failure to correct certain deficiencies identified in plaintiff's earlier visits to the Store. (Id. ¶¶ 8-9 & Ex. B.) YS&J failed to cure the default, and on 3 May 2013, plaintiff issued to YS&J a notice of termination of franchise. (Id. ¶ 10.)

Rather than shut down the Store at that time, plaintiff, YS&J, and YS&J's "principal stockholder," defendant John A Ribet III, entered into a Mutual Cancellation and Release. Pursuant to that agreement, "in an effort to allow [defendants] the opportunity to recoup some of their investment in the Store, [plaintiff] agree[d] to allow [defendants] the chance to sell the Store's" assets in lieu of termination. (Id. ¶ 11 & Ex. D.) Defendants were permitted to continue to operate the Store. However, if they did not sell the Store's assets by 19 January 2014, any rights under the original operating agreement terminated, and they were required to remove all trademarked materials and proprietary products and ingredients from the premises and refrain from operating a business at the Store location with a deceptively similar name to that of plaintiff or operating a competing store in that location. (Id. ¶¶ 12-13 & Ex. D, ¶¶ 1, 3a, 3c.) On 21 January 2014, plaintiff notified defendants that it was terminating the franchise for failure to transfer the assets of the Store. (Id. ¶ 15 & Ex. F.) The notice further informed defendants: "You must IMMEDIATELY CLOSE THIS STORE and immediately remove all 'DQ'/'Orange Julius' trademarks and proprietary products and ingredients from this store. This includes removal of all signage, point-of-sale materials, operations manuals, menu strips, logos, equipment identification, and all other items that bear any of the 'DQ'/'Orange Julius' trademarks." (Id., Ex. F (emphasis in original).)

Because defendants continued to operate the Store as a Dairy Queen®/Orange Julius® store, in February 2014, plaintiff twice sent defendants cease and desist letters. (Id. ¶ 18.) On 3 and 12 March 2014, a Business Consultant employed by plaintiff visited the Store and observed that the Store was still operating as a Dairy Queen®/Orange Julius® restaurant and the Dairy Queen®/Orange Julius® signs, insignia, proprietary products, and other materials had not been

2

removed.  (Piunti Decl., DE # 10, ¶¶ 8-9.)

On 13 March 2014, plaintiff initiated this action, asserting claims for trademark infringement pursuant to 15 U.S.C. § 1114, false designation of origin pursuant to 15 U.S.C. § 1125, breach of contract, and unjust enrichment.  The following day, plaintiff filed the instant motion and also sought a temporary restraining order.  The court denied temporary relief in order that defendants might be heard on the preliminary injunction motion on 2 April 2014.  (DE # 12.) Defendants have been served with the complaint, the instant motion, all supporting documentation, and the order setting the hearing.  (DE ## 13-14, 16-18, 24.)  As noted previously, defendants have not filed a response to the instant motion and did not appear at the hearing.

## II.  DISCUSSION

Plaintiff requests that the court enjoin defendants

> and all those in active participation with them (including officers, managers, guarantors, and employees) from:
> 1. Using or displaying the Dairy Queen® and Orange Julius® trademarks or any other marks similar to the Dairy Queen® and Orange Julius® trademarks;
> 2. Selling or distributing Dairy Queen® and Orange Julius® products;
> 3. Associating with the Dairy Queen® and Orange Julius® franchise system; and
> 4. Operating their store at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303, as a Dairy Queen® and/or Orange Julius® store or any other competing store, *i.e[.]*, a store selling soft serve treats and/or fruit-based drinks.

(Mot., DE # 8, at 1-2.)  "To obtain a preliminary injunction, a moving party must establish the presence of the following: (1) 'a clear showing that it will likely succeed on the merits'; (2) 'a

3

clear showing that it is likely to be irreparably harmed absent preliminary relief'; (3) the balance of equities tips in favor of the moving party; and (4) a preliminary injunction is in the public interest." United States v. South Carolina, 720 F.3d 518, 533 (4th Cir. 2013) (citation omitted). The court examines these factors in turn.

Plaintiff argues that it shows a likelihood of success on its trademark infringement and breach of contract claims. To succeed on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1), a party must establish "(1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers." People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001) (citations omitted). With respect to a holdover franchisee, which is alleged here,

> [t]here is a high risk of consumer confusion when a terminated franchisee continues to use the former franchisor's trademarks. Consumers will associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise would therefore be attributed to the franchisor. . . . "Because of this risk, many courts have held that continued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement."

Merry Maids Ltd. P'ship v. Kamara, 33 F. Supp. 2d 443, 445 (D. Md. 1998) (citation omitted).

Plaintiff and its affiliates own the Dairy Queen® and Orange Julius® trademarks. (Beck Decl., DE # 11, ¶ 4.) As shown by sworn declaration of plaintiff's Business Consultant and the photographs attached thereto, defendants continue to use without authorization the Dairy Queen® and Orange Julius® trademarks in connection with the operation of the Store, which is

4

selling food items. (Piunti Decl., DE # 10.) By continuing to use the very trademarks YS&J was originally licensed to use, defendants are confusing consumers. Based on the foregoing, the court concludes that plaintiff has clearly shown a likelihood of success on the merits of its trademark infringement claim.

Turning to its breach of contract claim, under North Carolina law,[1] the elements of such a claim are "(1) existence of a valid contract and (2) breach of the terms of that contract." <u>Ahmadi v. Triangle Rent A Car, Inc.</u>, 691 S.E.2d 101, 103 (N.C. Ct. App. 2010) (internal quotation marks and citation omitted). Among their post-termination obligations in the Mutual Cancellation and Release agreement, defendants "are required to immediately, upon the Termination Date, remove all trademarks, signs, insignia, proprietary products and ingredients, and all other materials noted . . . from the premises." (Beck Decl., Ex. D, ¶ 3a.) Also, defendants are limited in how they can compete with plaintiff.

> [Defendants] agree that they will not operate a business with a name that is deceptively similar to any of the trademarks, trade names and service marks of [plaintiff] at the Store location. In addition, [defendants] agree they will not operate at the Store location any competing store for a period of one year after the Termination Date. . . .

(<u>Id.</u> ¶ 3c.) In evaluating the validity of a non-compete provision in a franchise agreement, the North Carolina Court of Appeals has recognized that

> the ultimate issue which we must decide in resolving such disputes among franchisors and franchisees is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the

---

[1] Plaintiff relies on North Carolina law, (<u>see</u> Mem., DE # 9, at 9 n.1, 10-11), and the Mutual Cancellation and Release provides that it is governed by the laws of North Carolina, (Beck Decl., DE # 11-4, ¶ 9).

> reasonableness of the duration of the restriction, the
> reasonableness of the geographic scope of the restriction, and the
> extent to which the restriction is otherwise necessary to protect the
> legitimate interests of the franchisor.

Outdoor Lighting Perspectives Franchising, Inc. v. Harders, 747 S.E.2d 256, 263 (N.C. Ct. App. 2013).

By virtue of the fact that defendants continue to hold out the Store as a Dairy Queen® and Orange Julius® restaurant by displaying trademarked signage and materials and serving the same menu items, defendants have breached their obligation to remove that signage and materials. That conduct also breaches defendants' obligation to refrain from operating a business in the Store location with a deceptively similar name to plaintiff's trademarks. This obligation is valid given that plaintiff, as a franchisor, has a legitimate interest in protecting its franchise system from another entity trying to pass itself off as being affiliated with it, and this provision is not unnecessarily restrictive to protect that interest. Plaintiff has clearly shown a likelihood of success on the merits on its breach of contract claim.

Considering the irreparable harm plaintiff will suffer absent preliminary relief,

> [d]efendants' unauthorized use of plaintiff's trademarks gives rise
> to irreparable injury, in that plaintiff has lost control of its business
> reputation to this extent, there is a substantial likelihood of
> confusion of the purchasing public, there may be no meaningful
> monetary recovery available, and there is an inherent injury to the
> good will and reputation of the plaintiff. Such infringement is
> difficult to quantify and thus lends itself to injunctive relief.

Merry Maids, 33 F. Supp. 2d at 445 (citation and internal quotation marks omitted).

On the other hand, there is no doubt that defendants will suffer some financial loss and be otherwise burdened by the entry of preliminary injunctive relief against them. However, that harm is largely self-inflicted. Defendants knew what they were bargaining away when they

6

entered into the Mutual Cancellation and Release. It is not unjust to hold defendants to these mutually agreed upon obligations, particularly when weighed against the harm plaintiff is suffering from the continued, unauthorized operation of the Store with its trademarks. Thus, the court concludes that the balance of the equities favors plaintiff.

The public interest also favors the granting of preliminary injunctive relief.

> Preventing infringement and enforcing legitimate noncompete obligations serves the public interest in preventing consumer confusion. "A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public."

Id. at 446 (citing and quoting Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986)).

In sum, plaintiff has established all factors to warrant preliminary injunctive relief. It further requests that the court exercise its discretion to waive the requirement of posting security under Fed. R. Civ. P. 65(c) or, alternatively, to set the amount of security in a nominal amount. (Mem., DE # 9, at 18-19.) See also Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." (citations omitted)). As the Fourth Circuit Court of Appeals has noted:

> In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order. The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party:

> [T]he judge usually will fix security in an amount that covers the
> potential incidental and consequential costs as well as either the
> losses the unjustly enjoined or restrained party will suffer during
> the period he is prohibited from engaging in certain activities or
> the complainant's unjust enrichment caused by his adversary being
> improperly enjoined or restrained.
>
> 11A Charles Alan Wright et al., *Federal Practice & Procedure* §
> 2954, at 292 (2d ed. 1995). Where the district court determines
> that the risk of harm is remote, or that the circumstances otherwise
> warrant it, the court may fix the amount of the bond accordingly.
> In some circumstances, a nominal bond may suffice. *See, e.g.,
> International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.
> 1974) (approving district court's fixing bond amount at zero in the
> absence of evidence regarding likelihood of harm).

Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421-22 n.3 (4th Cir. 1999) (alteration in original). Considering that the risk of harm to defendants is remote given plaintiff's strong showing of entitlement to preliminary injunctive relief, the court will require plaintiff to post security in a relatively nominal amount.

### III. CONCLUSION

The court finds that plaintiff has made a clear showing of entitlement to preliminary injunctive relief, and therefore, its motion for preliminary injunction is ALLOWED. However, the court limits the scope of the applicability of the injunction to the Store location,[2] and because there is no evidence that defendants intend to open a competing store in that location, the court declines to extend the injunction to prohibit defendants from operating such a store. See Little Caesar Enters., Inc. v. R-J-L Foods, Inc., 796 F. Supp. 1026, 1036 (E.D. Mich. 1992) (where terminated franchisees were continuing to operate previously franchised pizza restaurant,

---

[2] Based on one of plaintiff's exhibits, it appears that one or both defendants may also operate (or formerly operated) a franchise in Durham. (See Piunti Decl., Ex. A, DE # 10-1 (email from Business Consultant to defendant Ribet discussing status of sale of Durham and Fayetteville stores and issues observed at both locations).) No other evidence in this case refers to a Durham store. The court wants to make clear that this order does not apply to any location other than the Store at Cross Creek Mall, Fayetteville, North Carolina.

8

granting franchisor injunctive relief but rejecting request for mandatory injunction prohibiting those franchisees from competing with franchisor for two years and from diverting or attempting to divert business from franchisor because there was "an insufficient factual record to rule on those issues").

Defendants and their officers, managers, guarantors, and employees are hereby ENJOINED until further order of this court from:

1. Using or displaying the DAIRY QUEEN® and ORANGE JULIUS® trademarks at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303;

2. Selling or distributing DAIRY QUEEN® and ORANGE JULIUS® products at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303; and

3. Operating their store at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303 as a DAIRY QUEEN® and/or ORANGE JULIUS® store.

Plaintiff shall post security with Clerk in the amount of $5,000.

This 2 April 2014.

W. Earl Britt
Senior U.S. District Judge

9

Case 5:14-cv-00151-BR   Document 26   Filed 04/02/14   Page 9 of 9