IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No: 5:14-cv-151-BR

| | | |
|---|---|---|
| American Dairy Queen Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>YS&J Enterprises, Inc. and John A. Ribet III,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT** |

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Plaintiff American Dairy Queen Corporation ("ADQ") requests the entry of default judgment against Defendants YS&J Enterprises, Inc. ("YS&J") and John A. Ribet III (together, "Defendants") for their failure to appear or otherwise defend. This application is supported by the contemporaneously filed declarations, ADQ's Memorandum of Points and Authorities, and all other papers and pleadings on file with the Court in this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

ADQ is a well-known nationwide franchisor of DAIRY QUEEN® and ORANGE JULIUS® restaurants. Defendants YS&J and John A. Ribet III are former ADQ franchisees. ADQ terminated Defendants' franchise agreement and right to operate as a DAIRY QUEEN®/ORANGE JULIUS® franchise and use the DAIRY QUEEN® and ORANGE JULIUS® trademarks at their restaurant. Despite that termination, Defendants

continued to operate their restaurant in violation of contractual obligations to ADQ and the Lanham Act.

ADQ filed its Complaint on March 13, 2014, in order to stop Defendants' trademark infringement, prevent Defendants' violation of a non-competition agreement, and collect sums owed by Defendants. The Court issued a preliminary injunction order against Defendants to prevent the ongoing infringement of ADQ's trademarks and violation of a non-competition agreement, but Defendants have not complied with the order. Defendants have never answered or otherwise responded to ADQ's Complaint. As a result, the Court entered default against Defendants on May 19, 2014. Now, with no other recourse for recovery as a result of Defendant's failure to defend this action, ADQ seeks entry of default judgment against Defendant.

## FACTS

The underlying facts supporting ADQ's Application for Default Judgment are fully set forth in ADQ's Complaint[1] (Dkt. No. 1), the declarations of Ron Piunti and Genevieve Beck filed in support of ADQ's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. Nos. 10-11, 22, hereafter "Piunti PI Decl." and "Beck PI Decl."), and the Court's Order dated April 2, 2014 (Dkt. No. 26). The key facts are summarized below.

### A. Defendants Default Under Their Operating Agreement.

ADQ and its affiliates own several federally registered DAIRY QUEEN® and ORANGE JULIUS® trademarks and service marks that they license for use in DAIRY QUEEN® restaurants ("DAIRY QUEEN® and ORANGE JULIUS® Marks"). (Compl. ¶

[1] The allegations in ADQ's Complaint are deemed admitted due to Defendants' failure to answer and default. Fed. R. Civ. P. 8(d); *Boyer v. Adams*, 2012 U.S. Dist. LEXIS 20892, at *3 (E.D.N.C. Feb. 17, 2012) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)).

10.) ADQ and YS&J entered into an operating agreement effective January 19, 2004 ("Operating Agreement") granting YS&J the right and license to establish and operate a DAIRY QUEEN® restaurant using the DAIRY QUEEN® and ORANGE JULIUS® Marks at 419 Cross Creek Mall, Fayetteville, North Carolina 28303 ("Fayetteville Restaurant"). (Compl. ¶14, Ex. A; Beck PI Decl. ¶6, Ex. A.) YS&J defaulted on its obligations under Section 5.C of the Operating Agreement and failed to cure the default. (Compl. ¶¶15-18, Exs. B-C; Beck PI Decl. ¶¶8-10, Exs. B-C.)

### B. The Mutual Cancellation and Release Agreement Gives Defendants an Opportunity to Transfer Their Franchise.

ADQ had the right to shut down the Fayetteville Restaurant on May 3, 2013. (Beck PI Decl. ¶11.) Instead, ADQ agreed to give Defendants additional time to sell their interests by entering into the Mutual Cancellation and Release with Defendants. (Compl. ¶19, Ex. D; Beck PI Decl. ¶11, Ex. D.) Specifically, the Mutual Cancellation and Release provided Defendants the right to operate the Fayetteville Restaurant under the prior Operating Agreement until January 19, 2014, but if they "fail[ed] to sell and complete all transfer requirements of the Store's business assets by 19 JAN 2014; the 'DQ'/'ORANGE JULIUS' Agreements, and all rights and licenses granted thereunder, are canceled, terminated, and shall have no further force and effect as of 19 JAN 2014." (Mutual Cancellation and Release §§ 1, 2.c.)

The Mutual Cancellation and Release also imposed obligations on Defendants if they failed to transfer their interests by January 19, 2014. (Beck PI Decl. ¶ 13.) In particular, the Mutual Cancellation and Release required Defendants to immediately "remove all trademarks, signs, insignia, proprietary products and ingredients, and [other materials] from

the premises." (Mutual Cancellation and Release § 3.a.) In addition, Defendants agreed that they would not (1) operate a business with a name that is deceptively similar to any of the trademarks, trade names, and service marks of ADQ at the store location or (2) operate at the store location any competing store (*i.e.*, selling soft serve treats and/or fruit-based drinks) for a period of one year after the termination date. (Mutual Cancellation and Release § 3.c.)

ADQ repeatedly reminded Defendants that they must transfer the Fayetteville Restaurant before the Mutual Cancellation and Release expired on January 19, 2014. (Compl. ¶27; Piunti PI Decl. ¶¶4-5.) For example, on October 23, 2013, ADQ's business consultant, Ron Piunti, told John Ribet III that ADQ would help with a transfer, but "time is running out" and "ultimately it's up to you to secure a transaction prior to termination." (Compl. ¶ 27, Ex. E; Piunti PI Decl. ¶ 4, Ex. A.) Similarly, on or around January 13, 2014, Ron Piunti emphatically reminded John Ribet III that he needed to transfer the Fayetteville Restaurant. (Compl. ¶ 27; Piunti PI Decl. ¶ 5.) Defendants did not respond with any effort to transfer the Fayetteville Restaurant prior to the deadline. (Beck PI Decl. ¶ 14.)

On January 21, 2014, ADQ provided Defendants with notice that it was terminating the Operating Agreement for failure to transfer the business assets of the Fayetteville Restaurant. (Compl. ¶ 29, Ex. F; Beck PI Decl. ¶ 15, Ex. F.) More than seven-and-a-half months had passed since the parties signed the Mutual Cancellation and Release. In the notice, ADQ reminded Defendants of their post-termination obligations to close the Fayetteville Restaurant and cease using the DAIRY QUEEN® and ORANGE JULIUS® Marks. (Compl. ¶ 29, Ex. F; Beck PI Decl. ¶ 15, Ex. F.)

### C. Defendants Continue to Operate the DQ®/ORANGE JULIUS® Store and Display the DAIRY QUEEN® and ORANGE JULIUS® Marks

Defendants did not comply with the Mutual Cancellation and Release's post-termination obligations. (Compl. ¶¶ 30-34; Beck PI Decl. ¶ 17; Piunti PI Decl. ¶¶ 7-9, Ex. B.) After January 21, 2014, Defendants continued to operate a DQ®/ORANGE JULIUS® store and display the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant. (*Id*.) On February 5, 2014, and again on February 17, 2014, ADQ demanded that Defendants cease using the DAIRY QUEEN® and ORANGE JULIUS® Marks and cease operating a DQ®/ORANGE JULIUS® store or any competitive business at the Fayetteville Restaurant. (Compl. ¶¶ 31, 33, Ex. G-H; Beck PI Decl. ¶ 18, Ex. G-H.) Defendants did not respond to ADQ's demands (Compl. ¶¶ 32, 34; Beck PI Decl. ¶ 19) and continued to operate a DQ®/ORANGE JULIUS® store and display the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant. (Compl. ¶ 34; Beck PI Decl. ¶ 19; Piunti PI Decl. ¶¶ 7-9.)

On March 3, 2014, ADQ's Business Consultant Ron Piunti visited the Fayetteville Restaurant and confirmed that Defendants continued to operate a DQ®/ORANGE JULIUS® store and display the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant. (Compl. ¶ 34, Ex. I; Piunti PI Decl. ¶ 8, Ex. B.) On March 12, 2014, ADQ's Business Consultant Ron Piunti confirmed that Defendants still operated a DQ®/ORANGE JULIUS® store and displayed the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant. (Piunti PI Decl. ¶ 9.)

**D. ADQ Files This Action Against Defendants.**

After Defendants ignored ADQ's cease and desist demands, ADQ brought this action alleging (1) Lanham Act trademark infringement, (2) Lanham Act false designation of origin, (3) breach of contract, and (4) unjust enrichment. (Compl. ¶¶ 35-66.) ADQ subsequently filed a motion for a preliminary injunction. (Dkt. No. 8.)

This Court granted ADQ's motion for a preliminary injunction on April 2, 2014. (Dkt. 26, "Preliminary Injunction Order.") The Preliminary Injunction Order enjoined Defendants and their officers, managers, guarantors, and employees from:

1. Using or displaying the DAIRY QUEEN® and ORANGE JULIUS® trademarks at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303;
2. Selling or distributing DAIRY QUEEN® and ORANGE JULIUS® products at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303; and
3. Operating their store at Cross Creek Mall, 419 Cross Creek Mall, Fayetteville, North Carolina 28303 as a DAIRY QUEEN® and/or ORANGE JULIUS® store.

(*Id.* at 9.) It also required that ADQ post security with the Clerk of $5,000. (*Id.* at 9.)

ADQ posted the security required by the Preliminary Injunction Order. (Dkt. No. 33.) But on April 9, 2014 and again on April 29, 2014, ADQ determined that Defendants continued using and displaying the DAIRY QUEEN® and ORANGE JULIUS® trademarks, selling and distributing DAIRY QUEEN® and ORANGE JULIUS® products, and operating as a DAIRY QUEEN® and ORANGE JULIUS® restaurant at the Fayetteville Restaurant.

(Dkt. No. 35 ¶¶ 5-6, Ex. A-B.) Indeed, Defendants ignored ADQ's demand to comply with the Preliminary Injunction Order and have made no effort whatsoever to comply with the Preliminary Injunction Order. (Dkt. No. 34 ¶¶ 2-3, Ex. A; Dkt. No. 35 ¶¶ 5-6, Ex. A-B.)

Defendants have never appeared in this action. (Dkt. No. 29.) ADQ moved for an entry of default on April 16, 2014 (Dkt. No. 28) and the Court entered default against Defendants on May 19, 2014. ADQ has also moved for an order of civil contempt and sanctions against Defendants (Dkt. No. 31), which the Court has set for a hearing on June 2, 2014. (Dkt. No. 38.)

## ARGUMENT

Once a party's default has been entered, the district court may grant default judgment against that party. Fed. R. Civ. P. 55(b)(2). Default judgment is warranted when the adversary process has been halted because of an essentially unresponsive party. *Boyer v. Adams*, 2012 U.S. Dist. LEXIS 20892, at *3 (E.D.N.C. Feb. 17, 2012) (citing *SEC v. Lawbaugh*, 359 F.Supp.2d 418, 421 (D. Md. 2005)). To enter default judgment, the court must determine whether the well-pleaded allegations support the relief sought in the complaint. *Boyer*, 2012 U.S. Dist. LEXIS 20892, at *3-4 (citing *Ryan*, 253 F.3d at 780).

Defendants have rejected the judicial process by failing to appear and flouting the Court's preliminary injunction order. ADQ's allegations and evidence support an award of a permanent injunction, Lanham Act damages, and attorneys' fees and costs.

### I. Default Judgment Is Necessary Because Defendants Are Unresponsive.

A court may enter default judgment when a defendant does not participate in the judicial proceeding. *E.g.*, *Emi April Music, Inc. v. Rodriguez*, 691 F. Supp. 2d 632, 634 (M.D.N.C. 2010) (granting default judgment) ("Defendants' recalcitrance should not delay

[p]laintiffs' entitlement to relief"). For example, in *JTH Tax, Inc. v. Smith*, the court granted default judgment against a holdover franchisee because the holdover franchisee "completely failed to defend the case, as well as the motion for default judgment." 2006 U.S. Dist. LEXIS 42584, at *5-6 (E.D. Va. June 23, 2006). Similarly, in *Senior Mgmt. v. Arnett Group, LLC*, the court entered default judgment because the defendants failed to answer an amended complaint and simply stopped participating in the action. 2013 U.S. Dist. LEXIS 91463, at * 6-7 (E.D.N.C. June 26, 2013). *See also Advantage Media Group v. Debnam*, 2011 U.S. Dist. LEXIS 62678, at *3-4 (M.D.N.C. June 10, 2011).

Defendants have wholly failed to appear in this action. They have disregarded the Complaint, ADQ's Motion for Temporary Restraining Order and Preliminary Injunction, the Court's Preliminary Injunction Order, ADQ's demand for compliance with the Preliminary Injunction Order, and ADQ's Motion for Entry of Default. Defendants spurn the judicial process even though they have received nearly every filing by personal service and were served with the Court's most recent order by the U.S. Marshal's Service. (Dkt. Nos. 18, 24, 27, 30, 42-44.) The default judgment remedy is designed precisely for this scenario.

## II. ADQ is Entitled to Default Judgment on Liability Because the Well-Pleaded Allegations Support the Relief Sought.

ADQ is entitled to default judgment on liability because the now-admitted factual allegations support its claim. "An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). Thus, a defendant admits the plaintiff's well-pleaded allegations of fact by his or her default. *Boyer*, 2012 U.S. Dist. LEXIS 20892, at *3 (E.D.N.C. Feb. 17, 2012) (citing *Ryan*, 253 F.3d at 780).

## A. ADQ's Well-Pleaded Allegations Support Its Lanham Act Claims

To prevail on Lanham Act claims under 15 U.S.C. §§ 1114 and 1125(a), ADQ must prove "(1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers." *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citation omitted).

"It is well settled that in a case where one party is allowed to use marks through a license from the registered party, usage of the mark after expiration or revocation of the license constitutes trademark infringement." *Hardee's Food Sys. v. Beardmore*, 1997 U.S. Dist. LEXIS 24210, at *8 (E.D.N.C. Oct. 24, 1997) (noting that franchisor was granted preliminary injunction on this basis). Likewise, many other courts have held that a franchisee's continued use of a franchisor's trademark after termination satisfies the likelihood of confusion test and constitutes trademark infringement. *E.g.*, *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983); *Meineke Car Care Ctrs., Inc. v. Bica*, 2011 U.S. Dist. LEXIS 118171, at *7-8 (W.D.N.C. Oct. 12, 2011); *Precision Tune Auto Care, Inc. v. Pinole Auto Care*, 2001 U.S. Dist. LEXIS 24840, at *14 (E.D. Va. Oct. 15, 2001); *Merry Maids Ltd. Pshp. v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998); *Hospitality Int'l v. Mahtani*, 1998 U.S. Dist. LEXIS 16445, at *63-64 (M.D.N.C. Aug. 3, 1998).

This Court has already held that ADQ made a clear showing that it will likely succeed on the merits of its Lanham Act claims:

> "Plaintiff and its affiliates own the Dairy Queen® and Orange Julius® trademarks. (Beck Decl., DE # 11, ¶ 4.) As shown by sworn declaration of plaintiff's Business Consultant and the photographs attached thereto, defendants continue to use without authorization the Dairy Queen® and Orange Julius® trademarks in connection with the operation of the Store, which is selling food items. (Piunti Decl., DE # 10.) By continuing to use the very trademarks YS&J was originally licensed to use, defendants are confusing consumers. Based on the foregoing, the court concludes that plaintiff has clearly shown a likelihood of success on the merits of its trademark infringement claim."

(Preliminary Injunction Order at 4-5.)

In addition to its evidence in support of a preliminary injunction, ADQ's well-pleaded allegations support the relief sought. ADQ and its affiliates own the DAIRY QUEEN® and ORANGE JULIUS® Marks. (Compl. ¶¶ 10, 36.) Defendants continue to use the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant in connection with the sale of products without any authorization. (Compl. ¶¶ 30-34, 39.) Finally, Defendants' illegal use of the DAIRY QUEEN® and ORANGE JULIUS® Marks is likely to confuse consumers into believing that the Fayetteville restaurant is validly licensed by ADQ. (Compl. ¶¶ 40, 47.)

**B. ADQ's Well-Pleaded Allegations Support Its Breach of Contract Claim**

To prevail on its breach of contract claim, ADQ must prove "(1) existence of a valid contract and (2) breach of the terms of that contract." *Ahmadi v. Triangle Rent a Car, Inc.*, 691 S.E.2d 101, 103 (N.C. Ct. App. 2010) (internal quotation marks and citation omitted).

This Court has already held that ADQ made a clear showing that it will likely succeed on the merits of its breach of contract claims:

> By virtue of the fact that defendants continue to hold out the Store as a Dairy Queen® and Orange Julius® restaurant by displaying trademarked signage and materials and serving the same menu items, defendants have breached their obligation to remove that signage and materials. That conduct also

> breaches defendants' obligation to refrain from operating a business in the Store location with a deceptively similar name to plaintiff's trademarks. This obligation is valid given that plaintiff, as a franchisor, has a legitimate interest in protecting its franchise system from another entity trying to pass itself off as being affiliated with it, and this provision is not unnecessarily restrictive to protect that interest. Plaintiff has clearly shown a likelihood of success on the merits on its breach of contract claim.

(Preliminary Injunction Order at 6.)

In addition to the evidence in support of a preliminary injunction, ADQ's well-pleaded allegations demonstrate that the Mutual Cancellation and Release was a valid contract (Compl. ¶¶ 19-26, 54 ) and that Defendants plainly breached their obligation to remove the DAIRY QUEEN® and ORANGE JULIUS® Marks from the Fayetteville Restaurant and cease operating a deceptively similar or competing business at the same location (Compl. ¶¶ 56-57, 59-60).

### C. ADQ's Well-Pleaded Allegations Support Its Unjust Enrichment Claim

To succeed on a claim for unjust enrichment, a plaintiff must establish that "(1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." *Primerica Life Ins. Co. v. James Massengill & Sons Const. Co.*, 211 N.C. App. 252, 259-260 (N.C. Ct. App 2011). An unjust enrichment claim is not precluded by a breach of contract claim where the existing contract does not cover the "whole subject matter" of the dispute. *Atkinson v. Reikowsky*, 753 S.E.2d 399 (N.C. Ct. App. 2013) (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 714, 124 S.E.2d 905, 908 (1962)).

If the Court determines that the Mutual Cancellation and Release does not cover the whole subject matter of this dispute, then ADQ would also be entitled to damages for unjust enrichment. ADQ has established that Defendants continue to receive the value and

goodwill associated with the DAIRY QUEEN® and ORANGE JULIUS® Marks. (Compl. ¶ 64.) Defendants not only consciously accepted the benefit that accompanies using the DAIRY QUEEN® and ORANGE JULIUS® Marks, but continue to usurp the benefit despite ADQ's cease and desist demands and the Preliminary Injunction Order. (Compl. ¶¶ 30-34; Preliminary Injunction Order at 8.)

## III. <u>ADQ is Entitled to a Permanent Injunction Without a Hearing.</u>

The Court should issue a permanent injunction prohibiting Defendants' from using the DAIRY QUEEN® and ORANGE JULIUS® Marks, selling DAIRY QUEEN® and ORANGE JULIUS® products, and operating as a DAIRY QUEEN® and ORANGE JULIUS® franchise or competing restaurant at the Fayetteville Restaurant.

A permanent injunction is suitable in the context of a default judgment. *Mary Kay, Inc. v. Ayres*, 827 F. Supp. 2d 584 (D.S.C. 2011) (granting permanent injunction for Lanham Act claims on default judgment); *Toolchex, Inc. v. Trainor*, 2009 U.S. Dist. LEXIS 64186 (E.D. Va. July 24, 2009) (granting permanent injunction for Lanham Act claims on default judgment); *JTH Tax, Inc.*, 2006 U.S. Dist. LEXIS 42584 (ordering that a permanent injunction shall issue on a default judgment against a terminated franchisee infringing on the franchisor's marks). The Lanham Act explicitly grants courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent … a violation [of the Act]." 15 U.S.C. § 1116(a). Indeed, an injunction is the preferred remedy to insure that future trademark infringement violations will not occur. *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) (upholding permanent injunction). The court may grant a permanent injunction without a hearing where the record clearly establishes the plaintiff's right to an injunction

and a hearing would not alter the result. *Lone Star Steakhouse & Saloon*, 43 F.3d at 938 (citing cases).

To receive a permanent injunction, a plaintiff must establish the following four factors: "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)). A court that previously granted a preliminary injunction may maintain the same holding on the factors that overlap with a permanent injunction if no additional evidence is presented. *See Toolchex, Inc.*, 2009 U.S. Dist. LEXIS 64186, at *6-7 (holding that the balance of hardships remained in the plaintiff's favor because the court found so in its preliminary injunction analysis and no other evidence had been presented in the alternative).

**A. ADQ Has Suffered An Irreparable Injury.**

Four reasons support a finding of irreparable injury in these circumstances. First, the Fourth Circuit holds that "irreparable injury regularly follows from trademark infringement." *Lone Star Steakhouse & Saloon*, 43 F.3d at 939; *Choice Hotels Int'l, Inc. v. Fisher*, 2014 U.S. Dist. LEXIS 25265, at *21-23 (N.D. W. Va. Feb. 27, 2014) (granting franchisor permanent injunction against holdover franchisee).

Second, a trademark registrant suffers irreparable injury if the infringement causes lost goodwill and customers. *Campbell Alliance Group, Inc. v. Dandekar*, 2014 U.S. Dist. LEXIS 1420, at *11 (E.D.N.C. Jan. 7, 2014) (finding irreparable harm because plaintiff demonstrated it was likely to suffer a loss of customer business and goodwill); *Meineke Car*

*Care Ctrs., Inc.*, 2011 U.S. Dist. LEXIS 118171, at *9 (finding franchisor likely to suffer actual, imminent, and irreparable harm "in the form of damage to its goodwill and reputation with consumers, loss of customers, and corresponding lost sales"); *Gilreath v. Tinder Box Int'l*, 1995 U.S. Dist. LEXIS 4195, at *9-12 (M.D.N.C. Feb. 14, 1995) (finding franchisor irreparably harmed by losses in customer base and goodwill because its former franchisee continued operating after termination in the same mall location, carrying the same products, and employing the same people).

Third, a franchisor suffers irreparable harm if it has lost control of its business reputation and the quality of its products. *Choice Hotels Int'l, Inc.*, 2014 U.S. Dist. LEXIS 25265, at *23 (irreparable harm resulted from lost faith in the plaintiff's products and damage to the plaintiff's reputation); *Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 153110, at *15-16 n.27 (D. Md. Oct. 24, 2013) ("In the franchise context, multiple cases note that the franchisor loses control of its business reputation and suffers irreparable harm when a terminated franchisee continues to operate its former franchise").

Finally, a franchisor suffers irreparable harm from the violation of a non-compete by a former franchisee. *Outdoor Lighting Perspectives Franchising, Inc. v. Home Amenities, Inc.*, 2012 U.S. Dist. LEXIS 5406, at *10-11 (W.D.N.C. Jan. 18, 2012); *Baskin-Robbins Inc. v. Golde*, 2000 U.S. Dist. LEXIS 22861, at *17-20 (E.D.N.C. May 25, 2000);

Consistent with these authorities, this Court has already explained that Defendants' unauthorized use of ADQ's trademarks gives rise to irreparable injury because the ADQ has lost control of his business reputation, the public is substantially likely to be confused, and there is inherent injury to ADQ's good will and reputation. (Preliminary Injunction Order at

6.) For the same reasons and now even more injurious two months later, ADQ satisfies the irreparable injury prong for a permanent injunction.

**B. ADQ's Remedies Available at Law Are Inadequate.**

Damages to reputation and goodwill are not easily measured by a calculation of damages. *Djarum v. Dhanraj Imps., Inc.*, 876 F. Supp. 2d 664, 669 (W.D.N.C. 2012); *Toolchex, Inc.*, 2009 U.S. Dist. LEXIS 64186, at *5-6 (citing *Lone Star Steakhouse & Saloon*, 43 F.3d at 939). Moreover, a defendant's inaction in response to litigation and refusal to acknowledge legal obligations only underscores the inadequacy of the remedies available at law. *Choice Hotels Int'l, Inc.*, 2014 U.S. Dist. LEXIS 25265, at *24; *Emi April Music, Inc.*, 691 F. Supp. 2d at 635 (granting permanent injunction on default judgment).

Consistent with these authorities, this Court has already explained that ADQ may not have meaningful monetary recovery available for Defendants' trademark infringement and that the damages are difficult to quantify. (Preliminary Injunction Order at 6.) As ADQ explain to the Court in March 2014 (Dkt. No. 9) and even more applicable two months later, damages cannot compensate for the fact that ADQ no longer has oversight of the Fayetteville Restaurant, ADQ has lost control of its marks, and ADQ's reputation and product quality are at serious risk given Defendants' history of failing to meet operating and quality standards. ADQ cannot be adequately compensated for lost goodwill and reputation that continues unabated as Defendants ignore the judicial process and refuse to acknowledge their legal obligations.

**C. The Balance of Hardships Favors ADQ.**

The balance of hardship weights against the party infringing on a trademark because the harm they suffer is being prohibited from falsely representing association with plaintiff,

but the plaintiff suffers irreparable harm in the form of consumer confusion and lost goodwill. *BSN Med., Inc. v. Art Witkowski*, 2008 U.S. Dist. LEXIS 95338, at *9-10 (W.D.N.C. Nov. 21, 2008); *see also Choice Hotels Int'l, Inc.*, 2014 U.S. Dist. LEXIS 25265, at *24 ("The balance of the hardships also favors granting a permanent injunction. The defendant is merely being stopped from infringing upon the plaintiff's trademarks"). In addition, a former licensee's self-inflicted harm ordinarily does not outweigh the licensor's irreparable harm. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992); *Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 153110, at *18 (D. Md. Oct. 24, 2013); *Meineke Car Care Ctrs., Inc. v. Bica*, 2011 U.S. Dist. LEXIS 118171, at *9-10 (W.D.N.C. Oct. 12, 2011); *Meineke Car Care Ctrs., Inc. v. Quinones*, 2006 U.S. Dist. LEXIS 40648, at *11 (W.D.N.C. June 1, 2006).

This Court has already held in issuing the Preliminary Injunction Order that the balance of equities for preliminary relief favored ADQ because the hardship that Defendants would suffer was largely self-inflicted while ADQ suffered from the continued, unauthorized operation of the Fayetteville Restaurant with ADQ's trademarks. (Preliminary Injunction Order at 6-7.) Still today, ADQ suffers the irreparable harm of consumer confusion and lost goodwill while the Defendants only harm comes from complying with their lawful obligations. Thus, the balance of hardships favors ADQ.

**D. The Public Interest is Served by the Injunction.**

The public interest is served by preventing trademark infringement and enforcing legitimate non-compete obligations. *Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998). This is because the public interest is often synonymous with the

right of the public not to be deceived or confused. *BSN Med., Inc.*, 2008 U.S. Dist. LEXIS 95338, at *10 (internal quotation omitted).

This Court has already held in issuing the Preliminary Injunction Order that preventing infringement and enforcing legitimate non-compete obligations serves the public interest in preventing customer confusion. (Preliminary Injunction Order at 7.) For the same reasons, the Court should hold that the public interest would be served by issuing a permanent injunction in this matter.

## IV. <u>ADQ is Entitled to Monetary Damages Without a Hearing.</u>

A court may determine damages on default judgment by relying on affidavits or documentary evidence in the record to determine the appropriate sum. *EEOC v. Carter Behavior Health Servs.*, 2011 U.S. Dist. LEXIS 129493,at *9-10 (E.D.N.C. Oct. 7, 2011) (internal citations omitted). Here, ADQ's affidavits and the documentary evidence in the record establish that ADQ's is entitled to the following damages:

- $31,363.03 for unpaid license fees and sales promotion program fees, calculated in accordance with the Operating Agreement and trebled in accordance with the Lanham Act, during Defendant's wrongful use of the DAIRY QUEEN® and ORANGE JULIUS® Marks and violation of the non-competition agreement (Piunti Decl.¶¶ 3-9);

- $72,001.75 for reasonable attorneys' fees pursuant to the Lanham Act (Bundy Decl.¶ 4; Smith Decl. ¶ 4.); and

- Reasonable costs as set forth in a Bill of Costs to be filed by ADQ with the Clerk within 14 days of the Court's ruling on this application.

### A. Lanham Act Damages Sustained

First, ADQ is entitled to actual damages or "any damages sustained" from the unauthorized use of the ORANGE JULIUS® and DAIRY QUEEN® Marks at the

Fayetteville Restaurant. 15 U.S.C. § 1117 (a). In assessing Lanham Act damages, the court should consider "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006). A court "may allow recovery for 'all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts.'" *Hospitality Int'l v. Mahtani*, 1998 U.S. Dist. LEXIS 16445, at *35 (M.D.N.C. Aug. 3, 1998).

In the franchise context, courts find that trademark infringement damages are equal to the fees the defendant would have paid for the use of the franchisor's trademarks. *JTH Tax, Inc.*, 2006 U.S. Dist. LEXIS 42584, at *8 (granting franchisor default judgment against holdover franchisee and awarding franchisor unpaid royalty fees for Lanham Act damages); *Hospitality Int'l*, 1998 U.S. Dist. LEXIS 16445, at *35-40 (awarding franchisor Lanham Act damages of the initial franchise fee, monthly royalty fees, monthly reservation fees, monthly advertising fees, and franchise sales expenses). *See also Ramada Inns v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks").

Here, ADQ is entitled to damages to the fullest extent permissible because (1) Defendants' conduct evinces their intent to deceive and confuse customers into believing they a lawfully licensed DAIRY QUEEN® and ORANGE JULIUS® restaurant; (2) Defendants have diverted sales to their unlicensed restaurant; (3) ADQ cannot be adequately compensated for damage to its reputation and goodwill, plus Defendants have shown by

ignoring the Preliminary Injunction Order that other remedies are inadequate; (4) ADQ did not unreasonably delay asserting their rights, but twice demanded that Defendants cease and desist within the first month of Defendants' unlawful operation of the Fayetteville Restaurant; (5) the public interest is served by preventing trademark infringement and enforcing legitimate non-compete obligations; and (6) Defendants' trademark infringement has been used to sell their products and misrepresent that ADQ endorses their products.

ADQ's actual damages include the license fees that Defendants would have paid for the use of the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant during the post-termination period. Defendants owe a license fee of "an amount equal to 6% of Gross Sales." (Compl. Ex. A. § 9.A, Ex. B § 2.c.) In addition, ADQ's actual damages also include the sales promotion fees that Defendants would have paid if they were licensed to use the DAIRY QUEEN® and ORANGE JULIUS® Marks at the Fayetteville Restaurant. *See Hospitality Int'l*, 1998 U.S. Dist. LEXIS 16445, at *40. Defendants owe a sales promotion program fee of "not less than 3% nor more than 6% of Licensee's Gross Sales" as established by ADQ. (Compl. Ex. A. § 9.C, Ex. B § 2.c.) "The sales promotion program fee is established and payable with respect to each component [of Defendants' store]." (Compl. Ex. A. § 9.C.) ADQ set the sales promotion program fee percentage at 1.25% of all ORANGE JULIUS® sales and 5% of all other sales for the Fayetteville Restaurant in 2014. (Piunti Decl.¶3.)

ADQ has retained $7888.14 as damages for trademark infringement, representing the license fees and sales promotion fees for January 21, 2014 – April 30, 2014 that Defendants have previously submitted to ADQ for the Fayetteville Restaurant. (Piunti Decl. ¶¶ 8-9.)

ADQ estimates[2] that the Fayetteville Restaurant will have May 2014 sales of $27,741.08 and June 2014 sales of $28,946.75. (Piunti Decl. ¶¶ 5-6.) By the end of June 2014, Defendants will owe another $3401.26 in license fees and $1793.99 in sales promotion program fees as trademark infringement damages. (Piunti Decl.¶7.) In addition to the amounts already retained, ADQ is entitled to actual damages of $3401.26 in license fees and $1793.99 in sales promotion program fees through June 2014.

**B. Lanham Act Treble Damages**

Second, ADQ is entitled an award of treble damages due to the "circumstances of the case." 15 U.S.C. § 1117 (a). The decision whether to award treble damages is within the court's discretion. *Larsen v. Terk Techs. Corp.,* 151 F.3d 140, 149 (4th Cir. 1998). Treble damages are appropriate in cases involving intentional or willful infringement. *Hockey Club of the Ohio Valley, LLC v. Eagle Mktg. Group, L.L.C.*, 2013 U.S. Dist. LEXIS 174021, at *12-15 (N.D. W. Va. Dec. 11, 2013) (awarding Lanham Act treble damages on default judgment); *Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 2013 U.S. Dist. LEXIS 105740, at *6 (E.D.N.C. July 28, 2013) (awarding treble damages); *Djarum*, 876 F. Supp. 2d at 671 (awarding Lanham Act treble damages on default judgment); *Hospitality Int'l v. Mahtani*, 1998 U.S. Dist. LEXIS 16445, at *41 (M.D.N.C. Aug. 3, 1998) (citing cases in franchise context for awarding treble damages). Intentional and willful infringement is present when the defendant misuses a trademark with full knowledge of the proprietary

[2] Although these calculations are estimates, "some speculation with respect to damages is permissible where, as here, a defendant's default has prevented damages from being computed with greater certainty." *Joe Hand Promotions, Inc. v. Coaches Sports Bar*, 812 F. Supp. 2d 702, 704 (E.D.N.C. 2011) (citing *Kingvision Pay-Per-View, Ltd. v. Arnoat,* No. 06 Civ. 4811(RPP), 2007 WL 2076632, at *6 (S.D.N.Y. July 13, 2007)).

nature of the mark. *Hospitality Int'l*, 1998 U.S. Dist. LEXIS 16445, at *43 (quoting *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980)).

Indeed, courts routinely award treble damages when a holdover franchisee continues to use the franchisor's trademarks after termination of the franchise. *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342-345 (6th Cir. 2010); *Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431, 435 (7th Cir. 1989) (holding that it might have been an abuse of discretion not to award treble damages against a holdover franchisee who uses the franchisor's marks after termination); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d at 1568 (11th Cir. 1986); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980), *aff'd sub nom.*, *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 (5th Cir. 1982); *Hospitality Int'l*, 1998 U.S. Dist. LEXIS 16445, at *41-45.

ADQ is entitled to treble damages here because Defendants are holdover franchisees who intentionally and willfully continue to use the DAIRY QUEEN® and ORANGE JULIUS® Marks despite ADQ's cease and desist demands, the Preliminary Injunction Order, and ADQ's demand for compliance with the Preliminary Injunction Order. Enhanced damages are also needed to compensate ADQ for its lost ability to control its brand image, reputation, and goodwill. Therefore, ADQ is entitled to treble damages of $31,363.03, which is three times the trademark infringement damages from January 21, 2014 to June 30, 2014 ($13,083.39), minus the amount ADQ has retained for trademark infringement damages ($7888.14). (*See* Piunti Decl. ¶¶ 7-9.)

**C. Costs and Attorneys' Fees**

Finally, ADQ is entitled to its costs and attorneys' fees[3] because this is an "exceptional" case under the Lanham Act. 15 U.S.C. § 1117(a). In the trademark infringement context, the Fourth Circuit deems a case "exceptional" if the defendant's conduct is "malicious, fraudulent, willful or deliberate in nature." *PETA*, 263 F.3d at 370 (citing *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 599 (4th Cir. 1992)). In other words, there must be a showing that the defendant acted in bad faith. *PETA*, 263 F.3d at 370.

Courts find bad faith and award costs and attorneys' fees for three reasons relevant to this matter. First, a defendant acts in bad faith by failing to respond to trademark infringement proceedings. *Two Men & a Truck(R)/Int'l, Inc. v. Clete, Inc.*, 2009 U.S. Dist. LEXIS 33768, *3-4 (W.D.N.C. Mar. 26, 2009) (concluding that defendants acted in bad faith because they had been unwilling to communicate about the infringement and failed to respond in court); *Toolchex, Inc.*, 2009 U.S. Dist. LEXIS 64186, at *11-12 (concluding that defendant acted in bad faith because defendant failed to respond to the trademark infringement proceedings against him). Second, a defendant acts in bad faith by using trademarks after the license to use the marks has terminated. *Toolchex, Inc.*, 2009 U.S. Dist. LEXIS 64186, at *11-12 (concluding that defendant acted in bad faith because he held himself out as permitted to use plaintiff's marks after his contract had expired). Third, a plaintiff entitled to treble damages is often also entitled to attorneys' fees for the same

[3] This request seeks all costs and attorneys' fees not otherwise awarded as part of ADQ's motion for civil contempt and sanctions. (Dkt. Nos. 31-32.)

reasons. *Hockey Club*, 2013 U.S. Dist. LEXIS 174021, at *21; *Georgia-Pacific Consumer Prods. LP*, 2013 U.S. Dist. LEXIS 105740, at *6-7.

The Court should award ADQ its costs and attorneys' fees because Defendants have exhibited bad faith and malicious, fraudulent, willful and deliberate conduct by failing to respond to these trademark infringement proceedings and continuing to use the DAIRY QUEEN® and ORANGE JULIUS® Marks without any authorization and in violation of a court order. To date, Plaintiff has incurred $72,001.75 in attorneys' fees prosecuting this action, as described in the attached Declarations of Kerry Bundy and Christopher Smith. (Bundy Decl.¶ 4; Smith Decl.¶ 4.) As to reasonable costs, Plaintiff will file a Bill of Costs with the Clerk within 14 days of the Court's ruling on this application.

## CONCLUSION

ADQ brought this action to enforce its lawful termination of Defendants' right to operate their restaurant as a DAIRY QUEEN®/ORANGE JULIUS® franchise and use the DAIRY QUEEN® ORANGE JULIUS® Marks. Defendants have not appeared in or defended this action, but continue to operate their former DAIRY QUEEN®/ORANGE JULIUS® franchise as if their right to do so was never terminated. With no other recourse, the Court should grant default judgment against Defendants and award ADQ a permanent injunction, $31,363.03 in damages, $72,001.75 in reasonable attorneys' fees, and reasonable costs as outlined in a subsequently filed Bill of Costs.

This the 30th day of May, 2014.

FAEGRE BAKER DANIELS LLP

By: /s/ *Kerry Bundy*

Kerry Bundy (MN Atty# 266917)
(*pro hac vice)*
Nick Rotchadl (MN Atty# 0393366)
(*pro hac vice)*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Phone: (612) 766-7000
Facsimile: (612) 766-1600
kerry.bundy@faegrebd.com
nick.rotchadl@faegrebd.com
*Attorneys for Plaintiff*

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, LLP

/s/ *Christopher G. Smith*

Christopher G. Smith
North Carolina State Bar No. 22767
Isaac A. Linnartz
North Carolina State Bar No. 39858
Post Office Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800
Email: csmith@smithlaw.com
Email: ilinnartz@smithlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of American Dairy Queen Corporation's Application for Default Judgment, [Proposed] Order of Default Judgment, and supporting declarations were served on Defendants John A. Ribet III and YS&J Enterprises, Inc. via U.S. Mail as follows:

YS&J Enterprises, Inc.
c/o its Registered Agent, John A. Ribet, III
7000 Windover Drive
Durham, NC 27712

John A. Ribet, III
7000 Windover Drive
Durham, NC 27712

In addition, personal service will be made as set forth in a subsequently filed Affidavit of Service.

This the 30th day of May, 2014.

FAEGRE BAKER DANIELS LLP

By: /s/ *Kerry Bundy*
Kerry Bundy (MN Atty# 266917)
(*pro hac vice)*
Nick Rotchadl (MN Atty# 0393366)
(*pro hac vice)*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Phone: (612) 766-7000
Facsimile: (612) 766-1600
kerry.bundy@faegrebd.com
nick.rotchadl@faegrebd.com
*Attorneys for Plaintiff*

US.54051671.04